Filed 10/9/14 In re J.D. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.D., a Person Coming Under the Juvenile Court Law. | B254280 (Los Angeles County Super. Ct. No. CK87515) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ELIZABETH S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Anthony Trendacosta, Juvenile Court Referee.  Reversed and remanded with directions.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Elizabeth S.

John F. Krattli, County Counsel, Dawyn Harrison, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

No appearance on behalf of Minor.

* * * * * *

Elizabeth S. (Mother) appeals from a juvenile court order terminating parental rights over her daughter, J.D., pursuant to Welfare and Institutions Code[1] section 366.26. Mother claims the juvenile court committed reversible error in failing to apply the section 366, subdivision (c)(1)(B)(i) exception to termination of parental rights. As an alternative argument, Mother asserts the order terminating her parental rights must be reversed because the juvenile court failed to ensure proper compliance with the notice requirements of the Indian Child Welfare Act (25 U.S.C. §§ 1901-1963) (ICWA).

We conditionally reverse the order terminating parental rights and remand the matter to ensure compliance with the ICWA. If, after receiving proper notice, no tribe indicates J.D. is an Indian child within the meaning of the ICWA, then the juvenile court shall reinstate the order terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Section 300 Petition and Detention**

On April 19, 2011, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of 14 month-old, J.D. As sustained the petition alleged, on prior occasions, Mother and J.D.'s father Joseph D.[2] (Father) engaged in altercations in which the Mother bit the Father. On a prior occasion, Father pushed Mother. The violent altercations on the part of Mother against Father endangered J.D.'s physical health and safety and placed J.D. at risk of physical harm, damage and danger. On prior occasions, Father left J.D. with Paternal Grandmother, C.D. (Paternal Grandmother), without making an appropriate plan for J.D.'s ongoing care and supervision. The failure to make an appropriate plan for J.D.'s ongoing care and

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    Father, who did not challenge the order terminating his parental rights, is not a party to this appeal.

supervision on the part of Father endangers J.D.'s physical health and safety and places J.D. at risk of physical harm and damage.

On January 22, 2011, the Child Protection Hotline received a referral that J.D. was the victim of sexual abuse. The referral stated that "the child's genitalia was red and that the child was complaining that it hurt." When Maternal Grandmother, Maria. S., was interviewed, she indicated that J.D. was visiting Mother earlier in the day. As Maternal Grandmother prepared to return J.D. to Father, Maternal Grandmother observed redness and irritation in J.D.'s vaginal area.

When Father was interviewed by an emergency social worker, Father denied that anyone had touched J.D. Father stated J.D. was given lots of affection, was well cared for and all her needs were met. J.D. appeared to be neatly dressed and groomed. Father disrobed J.D. in the presence of the social worker and a police officer. The social worker did not observe any marks or bruises on J.D. A medical examination of J.D. revealed no evidence of anal or genital trauma.

Father reported that, although Mother had no physical detects, she has Down's Syndrome and cannot care for J.D. on her own. Father provided a family law order, dated June 25, 2010, granting him full custody of J.D. Father had filed for custody because he was concerned that Mother was unable to care for J.D. appropriately. The family law order gave Mother two-hour monitored visits three days per week. The order provides that Maternal Grandparents were to monitor the visits and Mother was not to be left alone with J.D. during the visitation periods. In April 2011, while the matter was pending, the family law order was dismissed at Mother and Father's request after they reconciled in March 2011. Father indicated that he wanted the maternal relatives to have a relationship with J.D.

When Paternal Grandmother was interviewed, she also denied that anyone had touched J.D. in an inappropriate manner. Paternal Grandmother indicated that she and Paternal Grandfather cared for J.D. Paternal Grandmother stated she would be attending J.D.'s January 2011 doctor's appointment with Father.

3

Mother lives with Maternal Grandmother.  Mother stated that she did not "believe" that she could not care for J.D.  Mother reported that she had been receiving parenting services and Options for Independence (Options) classes through the Regional Center in Downey.  Mother stated that her case manager's name was Jennifer Carter (Carter).  Mother indicated that she and Father were currently separated but there was a chance they might work on their marriage.

Maternal Grandmother stated she did not have any concerns about J.D. staying with Father.  Maternal Grandmother indicated Mother had some developmental issues.  She said Mother has Down's Syndrome and functions intellectually at the level of a 13-year-old.

In an interview with Father on January 31, 2011, he reiterated his concern about Mother's ability to care for J.D. on her own.  Father stated that, when Mother would become angry, she might disregard J.D.  Father indicated that he continued to see Mother but he did not bring J.D. with him.

Father said he and Mother had been together for two years.  Father denied being violent against Mother.  However, he said Mother had been violent towards him on two different occasions.  In the first incident, Mother burned his clothes.  As a result, Father obtained a restraining order against her.  The second incident occurred at a park, when Mother became angry with Father and bit him.  Father filed a police report after the incident.  Father said J.D. was not present during the most recent domestic violence incident.

Paternal Grandmother stated she has concerns about Mother because Mother had insulted Father calling him the N-word and had made racial slurs against the paternal family.  Paternal Grandmother was concerned because J.D. is biracial.  Paternal Grandmother said she did not know about Mother's disability until after the parents married.  Paternal Grandmother was concerned about the level of supervision during Mother's monitored visits.

4

On February 18, 2011, Mother's case manager, Carter, reported that Mother was diagnosed with expressive, developmental and receptive language disorder when she was six years old. While in school, Mother had an Individual Education Plan, which diagnosed her specific learning disability. Mother was going to have another psychological evaluation to see if her diagnosis needed to be updated.

Carter indicated that Mother received 90 hours of in-home parenting services each month. Mother was reported to be doing well and responding positively to teachers, who came to Mother's home. Mother sometimes missed the parenting appointments but had not missed one since December 2010. Carter reported that the Maternal Grandparents are always there and always monitor visits between Mother and J.D. Carter stated that the Maternal Grandparents are very responsible and take good care of Mother.

Carter knew about the incident where Mother burned Father's clothes. Mother said she burned Father's clothes because he told her to do it. Carter was also aware of the biting incident. Mother told Carter it occurred because Father wanted to be intimate and she did not. Father became angry and told Mother to hit him so she bit him instead. Carter said sometimes Mother "doesn't make good decisions." Carter did not suspect that Mother abused or neglected J.D.

A previously assigned social worker, Lilia Aguire, who handled a March 2010 referral, indicated that the paternal relatives were very appropriate. They sought the family law order to protect J.D. when she was in Mother's custody. Aguire had no safety concerns for J.D. in Father's custody and no suspicion of sexual abuse.

On February 23, 2011, because there was no evidence of sexual abuse found during the investigation, the social worker offered Father alternative response services, which he accepted. However, on March 22, 2011, the alternative response services case manager, reported that Father's whereabouts were unknown. Paternal Grandparents said Father left on March 4, 2011, without informing them of where he was going. J.D. was left in the care of the Paternal Grandmother. After searching for Father in hospitals, the

morgue, and jail, paternal grandfather went to Maternal Grandmother's home and discovered Father was residing with Mother.

On March 24, 2011, Maternal Grandmother reported that Mother and Father moved into their own home. Maternal Grandmother's sister-in-law was living in the home with them. Maternal Grandmother reported that Mother and Father intended to have the family law order amended to allow J.D. to live with them.

When Mother was interviewed at her home on March 24, 2011, she stated that she and Father were arguing less now that they live together. Mother reported that she bites Father sometimes when they fight and she bit him in the last month. She reported that Father pushed her on the bed once while she was pregnant. Mother was still having her monitored visits three times a week. She thought she was ready to have J.D. with her. Mother stated that, if she became angry with Father, she would just "'walk away.'"

The social worker met with Mother, Father and maternal relatives. The Maternal Grandparents, who have been foster parents since 1996, explained in detail a safety plan for J.D.'s care. Mother, Father and Maternal Grandparents agreed to the plan, which all parties signed. On March 26, 2011, during an interview, Father stated his relationship with Mother was getting better. Father was ready to have J.D. with him. Father was not comfortable with Mother being alone with J.D. because Mother might not know what to do if something out of the ordinary happened. Father explained that the family law judge ordered monitored visits for Mother after observing that Mother was unable to care for J.D. without a monitor.

During an interview on March 26, 2011, Maternal Grandfather stated he thought Mother was doing well with her Options services. He felt the parents would be able to care for J.D. Mother could soothe her, prepare food and changer her diaper. J.D. was healthy and free of marks and bruises.

In a Team Decision Making meeting on March 31, 2011, Father disclosed that the family law order was still in place. Joanie Schultz from Options stated Mother "functions around the age of 13." It was hard for Schultz to assess Mother's parenting skills because

6

Mother is only with J.D. for a limited time during the week. Maternal Grandparents wanted Mother and Father to care for J.D. Maternal Grandparents also reported that Mother had post-partum depression after giving birth but had subsequently improved.

Because of the family law order requiring Mother to have monitored visits, a safety plan was proposed for Father to care for J.D. Father would have to move to a separate residence from Mother. Father said he would move back to the Paternal Grandparents' home. Mother refused to sign the safety plan that would have allowed Father to reside with J.D. by himself. Instead, Mother indicated she did not want to move out of her home and repeatedly stated, "'I already moved in.'"

Later in the day, Father called and said he was staying in the residence and Mother was moving in with her parents. On April 1, 2011, the social worker went to Father's home; Mother was not residing with Father. However, on April 4, 2011, Father called the social worker and said he moved back to his parents' home. Father explained that Mother had bitten him again after the team decision meeting (TDM).

On April 5, 2011, Paternal Grandparents called the department and reported Father had left J.D. with them on the previous night and had not returned home. Father did not say where he was going, did not leave any contact information and did not leave any documentation which would allow them to sign for medical care. The social worker could not contact Father because he does not have a telephone.

On April 12, 2011, Maternal Grandfather contacted the social worker and faxed the family law court's dismissal order to the social worker. Maternal Grandfather contacted the social worker for the next two days explaining various plans for caring for J.D., which included the Mother and Father and Maternal and Paternal Grandparents.

The department detained J.D. from Father due to the on-going domestic violence between Mother and Father with Mother as the perpetrator. Father was willing to move J.D. back into a home with him and Mother, which was indicative of his failure to protect. Father also repeatedly left J.D. for extended periods of time in the care of

7

Paternal Grandparents. Father failed to comply with the agreed upon safety plan. On April 19, 2011, J.D. was released to Paternal Grandmother.

At the April 2011 detention hearing, the juvenile court ordered J.D. detained with Paternal Grandparents. Father was allowed to remain in the home. Mother was given monitored visits in a neutral setting, where Father was not to act as the monitor. Father was given unmonitored visits but was ordered not to take J.D. to Mother. Father was ordered to inform Paternal Grandparents where he was going when he visited J.D. outside their home. Mother and Father were given referrals for domestic violence counseling, individual counseling, and parenting.

**Jurisdiction/Disposition**

The jurisdiction/disposition report stated J.D. was walking, running and babbling with Father and paternal relatives. She was using some words including mom, bottle, and water. Mother said J.D. lived in Maternal Grandparents' home until she was four months old, at which point Father gained custody. Father and J.D. began to live with Paternal Grandparents. According to Mother, Paternal Grandparents were the primary caretakers of J.D.

Mother did not want to be interviewed privately and insisted that her Options counselor and Maternal Grandmother be present for the entire interview. Mother answered all the investigator's questions. Mother denied burning Father's clothes but said Father had told her to do it. Mother said that she had cut up his clothes on one occasion and put toothpaste in his shoes. Mother stated she was in a psychiatric hospital for three or four days after that incident. She said she was not prescribed psychotropic medication because she was breastfeeding. Mother reiterated that Father pushed her onto a bed while she was pregnant. Mother admitted biting Father but said he told her to do so because it would make her feel better. Father and Mother had been together since 2008 and married in July 2009. Father lived with Mother but would leave whenever he was angry.

8

Father denied hitting Mother or telling her to burn his clothes or to bite him. Father stated that, when Mother is angry, she is violent and cries. Mother would often leave the house and cry in the streets. She would tell Father that he needed to let her bite him. Mother bit him when she was angry or he did not do something she wanted him to do. Father said that it rarely happened that Mother would bite him "'but there are times where it gets [out] of control.'" Mother bit him at least three or four times. On advice of his divorce attorney in November 2010, Father filed a police report against Mother after she bit him on the chest. The matter never went to court.

Father reported that Mother did not want anyone around J.D. Father did not think Mother was capable of caring for J.D. on her own. Father said Mother was not able to read J.D. meaning pick up on the child's needs. Father was also concerned about Mother's violent behavior. He stated Mother might snap at anytime and could hurt J.D. Father admitted that he left J.D. with his parents without telling them where he was going and when he was returning.

Maternal Grandmother reported that Mother needed a lot of help with her own daily routine. Given Mother's limitations, Maternal Grandmother was concerned about Mother's ability to care for J.D. on a daily basis. Maternal Grandmother reported that Mother and Father had a very violent relationship when they lived in an apartment. They would hit each other. To protect Mother, maternal relatives moved Mother into their home. However, Mother would go back to live with Father. Father pushed Mother when she was pregnant. Mother would defend Father and minimize the domestic violence. Maternal Grandmother thought Father was manipulating Mother and trying to take advantage of her developmental disability and then use it against Mother.

The Options family services worker, Ellamay Cruz, said Mother and Father had "'severe arguments.'" Father once threw hot water on Mother. She would bite Father every time a situation arose. Disagreements about little things would escalate into huge arguments. Options provided monitoring services and assisted Mother during monitored visits with J.D. Mother had only cared for J.D. in supervised situations. Cruz was

9

working with Mother on parenting issues like changing diapers and feeding times. She confirmed that Mother's interactions with J.D. needed to be monitored. Cruz said Mother needs continual prompting in caring for J.D. Mother would get sidetracked with texting or using her phone and would not recognize J.D.'s needs for feeding or changing. Cruz had to constantly remind Mother that J.D. had needs. Mother also had to be prompted to interact with J.D. Mother sometimes interacted with J.D. but would get easily distracted and did not maintain her interactions/bonding with J.D.

On June 27, 2011, Mother and Father pled no contest to the petition. The juvenile court sustained the petition, as amended pursuant to section 300, subdivision (b). The court declared J.D. a dependent of the court, removed her from Mother and Father's custody, and ordered her suitably placed. The department was ordered to provide family reunification services. Mother and Father were ordered to complete parenting programs and to participate in individual counseling to address domestic violence and anger management issues. Mother was given monitored visits. Father was given unmonitored visits, but Mother was not to be present at Father's visits. On August 22, 2011, the juvenile court signed an order allowing Maternal Grandparents to have weekend overnight visits with J.D. Mother could have monitored visits in Maternal Grandparents home but could not stay overnight.

**Six-Month Status Review**

In the January 2012 status review report, the department stated J.D. was a happy child. J.D. was doing well in Paternal Grandmother's home. J.D. visited twice a week with Mother. Maternal Grandmother monitored Mother's visits with J.D. Maternal Grandmother stated Mother spent time reading to J.D. and playing with her. Mother changed J.D.'s clothes and diapers. Mother would make simple food for J.D. Maternal Grandmother said J.D. appeared to be happy during the visits and J.D. recognized Mother as her mother.

Mother completed anger management and parenting classes. A January 17, 2012 letter from Mother's parenting instructor reported, Mother "could not explain what she

had learned and stated she would need to read over the lessons again. She also stated that her husband did the homework for her." The instructor felt that Mother would benefit from an in-home or hands-on training.

Neither Mother nor Father had enrolled in individual counseling to address domestic violence. Mother resided with her parents and Father lived with his parents. Mother and Father wanted to reunite with each other and J.D.

A September 14, 2011 letter from Options stated Mother and J.D.'s bond was strengthening and increased visits would help the bond to grow even more. Mother wrote a letter dated September 15, 2011, which stated she loved J.D. very much and enjoyed spending time with her.

A January 12, 2012 letter from Option's assistant director, Schultz, stated Mother continued to receive services including parenting training. Mother had become more accustomed to checking J.D. to see if a diaper change was needed without prompting. Mother interacted with J.D. and engaged her in play activities and reading. Mother also prepared snacks for J.D. when necessary. Mother had made great strides in improving her parenting skills but still needed guidance and training. The letter also stated Option's staff assisted Mother in completing her homework. Mother stated she and Father worked on their homework together for their parenting and domestic violence classes.

Paternal Grandmother reported that she thought Maternal Grandparents were allowing Mother to have overnight visits with J.D. Maternal Grandparents denied that they were violating the court-ordered condition that Mother not stay overnight during J.D.'s visits.

Adoption with Paternal Grandparents was identified as the concurrent planning goal in the event parents failed to reunify with J.D. The department recommended continued reunification services for the parents.

At the hearing on January 23, 2012, the juvenile court found the parents to be in partial compliance with the case plan. The department was ordered to continue providing family reunification services. The court modified Mother's visitation to unmonitored

11

including overnight visits in Maternal Grandmother's home. Mother's day visits were increased to six hours. Mother's visits were conditioned upon confirmation that she had enrolled in individual counseling. Parents were ordered not visit together.

**Twelve-Month Status Review**

In the 12-month status review report dated June 19, 2012, the department stated J.D. remained placed with Paternal Grandmother. J.D. was healthy, happy and developmentally on target. Paternal Grandparents wanted to adopt J.D. if the parents failed to reunify with her.

Mother resided with Maternal Grandparents and continued to participate in Options. Mother volunteered as a janitor at an animal shelter five days a week. She continued to participate in court-ordered programs.

Mother enrolled in individual counseling on March 26, 2012. Mother's therapist, Dr. Melanie Cain, indicated Mother had just begun to discuss the domestic violence issues. Dr. Cain stated Mother was more open during the sessions. Mother reported that she no longer had any fights or arguments with Father. Dr. Cain could not assess child safety issues because she never observed direct interaction between Mother and J.D.

When questioned by the social worker on March 22, 2012 and April 27, 2012, about domestic violence, Mother was very defensive. She stated she did not want to discuss the matter with the social worker. Mother was easily frustrated and upset at routine questions. Mother would often respond to the questions by saying "'I don't know.'" The department reported that Mother had completed a 12-week parenting education program and a 26-week anger management class. However, her developmental delays and lack of fundamental skills hindered Mother's ability to apply in daily social situations what she had learned in her parenting and anger management classes. Mother did not appear to have the ability to retain information from her programs. Mother felt that, because she had almost completed court-ordered programs, she should be able to gain custody of J.D. Mother wanted to reunify with Father and J.D.

Father moved out of Paternal Grandparents' home because he did not want to abide by their rules. Father was homeless and lived in shelters. Paternal Grandparents said Father would often ask for money to register for individual counseling and transportation needs. They would subsequently discover Father had spent the money paying for motel rooms so that he and Mother could be together. Father spent most of his time outside the home instead of spending time with J.D. Father indicated he wanted to reunify with J.D. and Mother. On April 27, 2012, Father reiterated that he thought Mother could not care for J.D. without help because of Mother's developmental issues. If he could not reunify with J.D., he wanted Paternal Grandparents to care for J.D.

Paternal Grandmother suspected that Father was not homeless but was residing with the Maternal Grandparents. She thought that Father and Mother were visiting J.D. together in Maternal Grandmother's home because Father spent most of his time there. Paternal Grandmother was concerned about J.D.'s safety during the visits. Maternal Grandparents, Mother and Father all denied that Mother and Father visited J.D. together. Maternal Grandparents were planning to buy Mother and Father a trailer. Maternal Grandfather assisted Father in obtaining employment and wanted to continue supporting parents so they could reunify with J.D.

On June 19, 2012, the juvenile court ordered unmonitored visits for Father and Mother. Mother's visits were to occur in Maternal Grandmother's home. The court continued the matter for a contested hearing. The court ordered the department to prepare a supplemental report "to address parents' progress in programs, updated information, and any change in recommendation."

In the August 2012 supplemental report, the department stated Father was interviewed on July 18, 2012. Father reported that Mother is still violent toward him. Mother would easily get upset whenever she cannot have her way. Mother often hit him or punched him with her fists. Father said he did not trust Mother to care for J.D. Father did not report the continued violence earlier because Father worked for Maternal

13

Grandfather and Father was afraid of losing his job. Father wanted to save his money and get his own place to live.

Father said he was living with a friend. Father refused to give his address to the social worker. Father said he had just enrolled in individual counseling but could not remember the name of the counselor or counseling agency and did not provide any contact information. Father stated he was not sure when he would be able to obtain suitable housing for himself and J.D. With Mother's on-going domestic violence toward him, he would not be able to reunify with J.D. in the future. On July 18, 2012, Paternal Grandmother reported Father did not show up for visits and had not asked for any visits since June 19, 2012.

Mother denied being abusive towards Father. Mother stated she planned to stay with Father. Maternal Grandparents would assist them to get stable housing in the near future. Mother visited J.D. every Tuesday and Thursday for about five to seven hours per visit. The visits were monitored by Mother's Regional Center workers when they occurred outside the Maternal Grandmother's home. The visits were good and appropriate. They watched children's movies or played in the backyard. Mother continued with individual counseling.

The department noted that the domestic violence issues remained unresolved between the parents, who wanted to continue their relationship with each other. Father was financially dependent on the maternal relatives. It did not appear that Mother learned any valuable lessons from her parenting or anger management classes. The department recommended that the court terminate family reunification services and that a selection and implementation hearing be set.

In a Last Minute Information for the Court dated September 24, 2012, the department reported parents' visitation schedule. Mother had six-hour unmonitored visits, two times a week. Mother shared meals or watched children's movies with J.D. during the visits. J.D. returned from the visits clean and well.

14

At the contested hearing on September 24, 2012, the juvenile court found Mother in compliance with the case plan and Father in partial compliance with the case plan. The department was ordered to continue family reunification services. The court ordered the department to convene a TDM to include Mother, Father, Maternal and Paternal Grandparents, service providers, therapists, and Regional Center providers. The meeting was to address a safety plan for the parents and J.D. and recommendation as to whether the monitored or unmonitored visits should occur for both parents with Mother being observed during the visit. Mother and Father were to be referred for conjoint counseling.

**Eighteen-Month Status Review**

In the November 2012 eighteen-month status review report, the department indicated that J.D. remained placed with Paternal Grandmother. J.D. was doing well in her placement. She was age appropriate and presented no concerns. J.D.'s caretakers reported that she is happy and healthy.

Mother continued receiving services from Options and working as a volunteer. A TDM was held on October 26, 2012. Mother's therapist, Dr. Cain, provided a letter dated October 22, 2012, showing Mother's progress. Dr. Cain stated that Mother had attended 30 individual sessions. The sessions focused on assisting Mother with increasing independence and assertive communication. The sessions also explored decreasing conflict with her spouse, identifying her level of anger, and alternative responses to anger such as communication, walking away and taking a break from the distressing situation. Dr. Cain stated that Mother "continues to report increased comfort with independently tending to her daughter's need and enjoys learning new ways to be a parent." In a prior letter dated, September 17, 2012, Dr. Cain wrote that Mother reported that her "motherly bond with her daughter has increased and she is committed to doing whatever is necessary for her child."

On October 25, 2012, the social worker spoke to Dr. Cain, who stated she could not make any judgment about Mother's behaviors or ability to parent a child. Dr. Cain added that she did not want to discriminate against Mother for being developmentally

15

delayed. Dr. Cain opined that Mother could care for J.D. with support and supervision from Maternal Grandparents and Options.

On October 26, 2012, Mother reported that she and Father had two physical altercations, one in September 2012 at Knott's Berry Farm and one in October 2012, at Father's place of employment. Mother bit Father's chest during the Knott's Berry Farm incident after he refused to let her leave. J.D. was not present at the time. Mother said she also bit Father's arm while he was working at the church because he refused to give her X-Box game to her. J.D. was being supervised by Maternal Grandparents in the same building at the time Mother bit Father's arm.

Father confirmed the two biting incidents, which occurred within two months of the status review report. Father said that Mother bit his arm out of frustration and anger when he would not give her the X-Box. There was open skin and bleeding. Father showed the TDM participants a healed scar where Mother had bitten him. Father enrolled in individual counseling and attended three of seven scheduled sessions.

Mother had unmonitored six-hour visits twice a week in Maternal Grandparents' home. During those visits, Mother and J.D. ate and watched movies. If Mother and J.D. visit outside the home, the visits are monitored by Mother's Options' counselor, Cruz. According to Cruz, when Mother started visiting J.D. in 2011, Mother needed prompting to care for and interact with J.D. In the past three or four months, Mother did not need as much prompting to attend to J.D.'s needs. In addition, J.D. had started asking more of Mother rather than running to Maternal Grandmother.

Mother reported that she wanted to reunify with J.D. and Father. Mother thought she could support J.D. with SSI if Maternal Grandparents provided them with a home. Mother wanted to continue her relationship with Father in spite of the two recent physical altercations.

Father reported that he did not believe Mother alone could care for J.D. or have unmonitored visits with her. Father felt J.D.'s safety could be compromised because

16

Mother tended to get angry when she did not get her way. He too wanted to continue his relationship with Mother even though they had engaged in two recent violent altercations.

Maternal Grandfather stated that Mother's anger and physical violence toward Father were the result of manipulation and provocation by Father. Maternal Grandfather did not believe Mother was violent and had learned to control her emotions through individual counseling. He thought Mother should be reunified with J.D. and that Mother was capable of having unmonitored visits.

Paternal Grandparents wanted to adopt J.D. if parents failed to reunify with her. The department recommended the court terminate parental rights and set the matter for a section 366.26 hearing to select and implement a permanent plan for J.D. The juvenile court continued the matter for a contested hearing.

In a December 2012 supplemental report, the department stated the social worker met with Mother on November 28, 2012. The meeting was at Maternal Grandparents' home and included Mother's Options' counselor and Maternal Grandfather. When the social worker questioned Mother about future plans with Father, Mother shrugged her shoulders replied she did not know. Mother also did not want to continue conjoint counseling stating it was not court-ordered. Mother stated she wanted to focus on reuniting with J.D. although Mother was unable to say how she would take care of J.D. Mother spoke with Father on the telephone several times a week. However, she did not see him in person. Mother was constantly looking at Cruz and Maternal Grandmother during the meeting.

Cruz said J.D. appeared to enjoy visiting Mother. They visited about four hours twice a week. Mother made a good effort to keep J.D. engaged in playing and in interacting with Mother by reading or playing.

Paternal Grandfather reported that J.D. was doing well in her placement. She enjoyed preschool. J.D. had behavioral issues after her visits with Mother and Maternal Grandparents such as sucking her thumb. Paternal Grandfather attributed the behavior to

17

missing Mother and Maternal Grandparents right after the visit. Father was visiting more regularly and spending time playing and reading with J.D.

In a January 18, 2013, Last Minute Information for the Court, the department reported that a TDM was held on January 9, 2013. Mother and Maternal Grandparents refused to attend the meeting. At the meeting, Paternal Grandparents refused to allow Father to live in their home. They did not trust Father to protect J.D. from Mother. They did not believe that J.D. was Father's number one priority. They said Father continued to have a relationship with Mother, who had a history of domestic violence against him.

Father confirmed that he chose to be with Mother in spite of her violent behavior. Father said he did not trust Mother to be alone with J.D. because of Mother's unpredictable angry outbursts and behavior.

On January 18, 2013, the court terminated reunification services and set the matter for a section 366.26 hearing.

**The Sections 366.26 and 388 Hearing**

In the May 2013 section 366.26 report, the department stated J.D. had remained placed with her prospective adoptive family, Paternal Grandparents, since April 2011. J.D. has been provided with adequate care and supervision. She was strongly bonded with Paternal Grandparents, who wanted to provide her with a stable and permanent home. They love J.D. and want to keep her safe. They were committed to J.D. The department recommended that parental rights be terminated with a plan of adoption.

Mother filed a section 388 petition on July 8, 2013. Mother requested the juvenile court to return custody of J.D. to her and to reinstate family reunification services with unmonitored visits. Attached to the petition was a letter from Dr. Cain dated May 13, 2013. The letter stated Mother had attended 54 individual therapy sessions. Mother continued to make J.D. a priority and enjoyed the opportunity to spend time with her during visits. A May 14, 2013 letter from Mother's social vocational manager described Mother's participation as a volunteer at the animal shelter. The juvenile court granted a hearing on the section 388 petition.

18

The July 2013 status review report for the permanent plan hearing stated J.D. visited with Mother twice a week. Father had not visited J.D. since January 18, 2013. J.D. was doing well in the home of Paternal Grandparents, who remained committed to providing a stable, loving and nurturing home environment for her. J.D. appears to be quite comfortable and happy in her prospective adoptive home. She is always clean, well dressed and is healthy and happy. Maternal Grandparents take J.D. to medical appointments and have enrolled her in preschool.

The department reported that Mother has intellectual, social and emotional disabilities for which she receives Regional Center services. Mother needed to continue participating in her Regional Center programs to assist her in improving her living and social skills. Mother continued in individual counseling to deal with the case issue of domestic violence. Mother chose to continue a relationship with Father even though they continued to have domestic violence incidents. Mother planned to reside with Father in the near future. Mother is very dependent on Father for emotional support and also relies on Maternal Grandparents for emotional and financial support.

Father had only partially complied with court orders. Father did not enroll in individual counseling until September 14, 2012, and then missed three out of seven sessions. Father has not addressed his domestic violence problems. Father chooses to remain in a relationship with Mother despite their on-going domestic violence incidents. Father has no stable housing and depends on Maternal Grandparents for financial support.

Attached to the July 2013 status report was a letter from Dr. Cain which indicated Mother had completed 60 individual therapy sessions. Mother continued to attempt to independently care for J.D.; however, Maternal Grandmother's protective nature did not always allow this to happen. Mother enjoyed visits with J.D. "and is making more efforts to independently provide care for her daughter."

The department continued to recommend termination of parental rights. In a Last Minute Information for the Court dated July 19, 2013, the department advised the juvenile court that the Paternal Grandparents' adoptive homestudy had been approved.

On July 19, 2013, the juvenile court held combined section 388 petition and section 366.26 hearings. Mother testified that J.D. called her "Mommy." Mother visited J.D. on Tuesdays and Thursdays and on every other weekend J.D. sleeps over at Mother's home. The two went to the park, playground, mall and library. An Options worker went with Mother and J.D. to the park. Mother and J.D. did "little projects" with paper and glue. Mother prepared eggs and rice for J.D. to eat. Mother would assist J.D. in changing clothes. However, Mother would be present when Maternal Grandmother bathed and cleaned J.D. Mother resided with Maternal Grandparents.

Mother also testified that Father was not present during her visits with J.D. Father had dropped off boxes in front of maternal grandparents' home while J.D. was in the living room. Mother went out on dates with Father and had gone on one with him the day before she testified.

In argument, the department asserted the juvenile court should deny Mother's section 388 petition, terminate parental rights, and "free" J.D. for adoption. J.D.'s attorney joined the department's requests. Mother requested the court grant the section 388 petition and not terminate parental rights. The court denied the section 388 petition finding there were no changed circumstances and it was not in J.D.'s best interests.

The juvenile court found Mother failed to meet her burden of establishing an exception under section 366.26, subdivision(c)(1)(B)(i). The court noted that Mother had not had physical custody of J.D. even before April 2011 when the dependency proceeding began because of the family law order. Mother's visits were "almost always with someone else present." The court indicated it appreciated the fact Mother had gone to all her individual therapy sessions. However, the court stated: "But after 60 individual therapy sessions the best that her therapist can say is that she's making more efforts to

20

independently provide care for her daughter."  The court further noted that Mother and Father continued their relationship without addressing the case issue of domestic violence.  The court pointed out that, while Mother did some things a parent would do, Paternal Grandparents acted as J.D.'s parents.  The court also noted that, during Mother's visits, Maternal Grandmother assumed most of the parental responsibility.  The court found J.D. adoptable, terminated parental rights and ordered a plan of adoption.  The record does not show that Mother was served with the order terminating her parental rights.

On January 17, 2014, the department filed a status review report for a post permanent plan review hearing.  After the January 17, 2014 hearing, Mother filed a notice of appeal.  Mother checked a box under section 360 (declaration of dependency).  Mother stated she wanted "to get my daughter back I am doing everything in my interest to comply."  Mother also described her appeal as one "to get my daughter to return home."

**ICWA FACTS**

The detention report stated that ICWA might apply because Paternal Grandmother stated that she has Cherokee ancestry from her mother.  Mother denied America Indian ancestry.   Father completed an ICWA form on April 19, 2011, indicating that one or more of his ancestors is or was a member of a federally recognized tribe.  Father was not aware of which tribe but wrote it was his great grandmother "Mattie [B.] 1911."  At the April 2011 detention hearing, the juvenile court ordered the department to follow-up on possible American Indian heritage through paternal great-great-grandmother, Mattie B.

The May 2011 jurisdiction/disposition report indicated that Paternal Grandmother stated that one of her grandparents was believed to be Cherokee but she was not sure of the tribe or state.  Paternal Grandmother did not believe that any family members were registered with a tribe or would meet qualifications for registration.  However, she provided the department with her family information.  The department reported it sent notices by registered mail to the Bureau of Indian Affairs, the Department of the Interior,

Cherokee Nation, Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians.  The department attached to the jurisdiction report return receipts from the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee Indians, and the Bureau of Indian Affairs.  The department also attached a letter from the United Keetoowah Band of Cherokee Indians indicating J.D. was not eligible for membership.

The June 2012 status review report stated that a letter dated June 2, 2011 from the Cherokee Nation indicated that J.D. was not an Indian child in relation to the tribe.  The letter stated that the determination was based on the information provided and that any incorrect or omitted information might invalidate the determination.  The department attached a list of ICWA notices sent by registered mail and return receipts.  The notices did not mention the ancestor Mattie B.

On November 5, 2012, the juvenile court found that ICWA did not apply.

## DISCUSSION

### I. Jurisdiction to Determine Appeal

As a preliminary matter, the department asserts we lack jurisdiction to consider Mother's appeal because the notice of appeal did not check the section 366.26 box on the Judicial Council form.  "'[I]t is, and has been, the law of this state that notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced.' [Citations.]  A notice of appeal 'is sufficient if it identifies the particular judgment or order being appealed.' [Citation.]" (*In re Joshua S.* (2007) 41 Cal.4th 261, 272.)  An appellate court will liberally construe an appeal where:  the order is appealable; the notice of appeal is timely; and there is no prejudice to the respondent. (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1449-1450.)

In this case, we liberally construe Mother's notice of appeal to be from the order terminating her parental rights.  First, an order terminating parental rights is appealable. (§ 395.)  Second, the department does not dispute Mother's assertion that the notice of appeal is timely because the order terminating her parental rights was rendered by

22

Commissioner Anthony Trendacosta, appointed to sit as a juvenile court referee. (Super. Ct. L.A. County, Local Rules, rule 7.33.) And, the record does not reflect that the commissioner provided Mother with notice as required by section 248 and California Rules of Court, rule 5.538(b). (See also § 250.) Thus, the appeal is timely given the failure to serve Mother with the order terminating her parental rights. Third, it is also reasonably clear that Mother was contesting the juvenile court's order refusing to return J.D. to her and the department has not argued prejudice.

Moreover, because there is no record that Mother was ever served with notice that her parental rights were terminated pursuant to section 366.26, Mother's pro. per. notice of appeal is entitled to a liberal construction under the circumstances of this case. (*In re Joshua S., supra,* 41 Cal.4th at p. 272; *In re Madison W., supra,* 141 Cal.App.4th at pp. 1450-1451.) Mother, who has Down's Syndrome, functions at the age of a 13-year-old. Although Mother checked a box under section 360 (declaration of dependency), Mother specifically stated she wanted "to get my daughter back I am doing everything in my interest to comply." Mother also described her appeal as one "to get my daughter to return home." Under the circumstances, the department is incorrect in asserting that the notice of appeal was insufficient to establish jurisdiction to review the order terminating parental rights.

## II. Termination of Parental Rights

Mother does not claim J.D. was not adoptable. Rather, Mother claims the juvenile court committed reversible error in failing to apply the exception to termination of parental rights contained in section 366.26, subdivision(c)(1)(B)(i). There is some discrepancy between appellate courts as to what standard of review applies—sufficiency of the evidence or abuse of discretion. (Cf. *In re S.B.* (2008) 164 Cal.App.4th 289, 297-298 and *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [the determination of whether an exceptional circumstance exists is customarily challenged for sufficiency of evidence] with *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1342 [abuse of discretion applied to determination of whether parent-child exception existed] and *In re T.S.* (2009) 175

Cal.App.4th 1031, 1038 [Indian child exception].)  Some courts apply a hybrid of the two standards.  (*In re C.B.* (2010) 190 Cal.App.4th 102, 122-123; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  Under this standard, the juvenile court has discretion to resolve whether a statutory exception exists such that termination of parental rights would be detrimental to an adoptable child.  (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1322; *In re Jasmine D., supra,* at p. 1342.)  However, the juvenile court's pure factual findings are reviewed for substantial evidence.  (*In re C.B.*, *supra*, at p. 122; *In re Jasmine D.*, *supra*, at p. 1351.)  Under either standard, there was no reversible error in this case.

If a child is likely to be adopted, the preferred permanent plan, at a section 366.26 hearing, is adoption.  (*In re Celine R.* (2003) 31 Cal.4th 45, 53; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1348.)  The parent has the burden of raising any relevant exception in the juvenile court.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402-403.)  Mother has the burden of producing evidence showing the exception applies.  (*In re Celine R.*, *supra*, at p. 61; *In re Bailey J., supra,* 189 Cal.App.4th at p. 1314.)

Mother claims she established the exception by showing regular and consistent visitation and that she and J.D. are bonded.  To determine whether the exception applies, the juvenile court should consider:  the age of the child; the portion of the child's life spent in the parent's custody; the positive and negative interaction between the parent and the child; and the child's particular needs.  (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

"In the context of the dependency scheme prescribed by the Legislature, . . . the 'benefit from continuing the [parent/child] relationship' exception [means] the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new

24

family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Mother did not show she had a parental role as opposed to a mere friendship with J.D. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854; [parents must show at least one biological parent occupies a parental role rather than a friendship].) Instead, Mother only showed frequent contact with pleasant visits, which did not establish a parental role. (See *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108, 1109 [parents are required to establish more than "'frequent and loving contact'" or an "emotional bond" accompanied by pleasant visits but must show "'parental role'"].) Mother did not produce any evidence that she provided daily nurturing to J.D., which was indicative of a strong parent-child bond after April 2011 when the dependency proceeding began. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.) Furthermore, as the court pointed out, J.D. was not in Mother's custody at that time due to the family law order giving Father custody of J.D., when she was four months old.

J.D. was over three and half years old when parental rights were terminated. The dependency action was filed in April 2011 when J.D. was 14 months old. We acknowledge that Mother continued to participate in court-ordered programs during the two-year period after the dependency petition filed. However, Mother and Father had not resolved any of the issues which brought the family to the court's attention. Mother and

Father continued the on again off again domestic violence filled relationship throughout the proceedings.

Although J.D. had happy visits with Mother, Mother had not provided for J.D.'s daily needs or care since J.D. was four months old. J.D. had been living with Paternal Grandparents since Father had moved in with his parents after he and Mother separated. Thus, for the bulk of J.D.'s life, she had lived with Paternal Grandparents, who were her prospective adoptive family. For most of her life, J.D.'s daily needs and care were met by Paternal Grandparents, who wanted to adopt her. Under the circumstances, the juvenile court did not err in terminating parental rights given the absence of evidence showing "the existence of such a strong and beneficial parent-child relationship" which "outweighs the child's need for a stable and permanent home." (*In re Casey D., supra,* 70 Cal.App.4th at p. 51.)

## III. ICWA Compliance

Mother asserts the order must be reversed on the ground ICWA notice requirements were not met because the department failed to include sufficient information about paternal relative Mattie B. "[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a).)

The department concedes that there were irregularities in complying with the notice requirements in that Mattie B. was confirmed by Paternal Grandmother to have a Cherokee heritage. However, the notices sent to the Cherokee tribes did not contain ancestor Mattie B.'s name. In addition, there was no signed return receipt from the Eastern Band of Cherokee Indians in the record. The department concedes that the return receipts and responses were not provided to the court and asks that the termination order be reversed and remanded for the sole purpose of complying with the notice requirements.

26

We agree that the termination order must be reversed for the limited purpose of determining compliance with the notice requirements. (See *In re Brooke C.* (2005) 127 Cal.App.4th 377, 385; *In re Miguel E.* (2004) 120 Cal.App.4th 521, 549-550; *In re Karla C.* (2003) 113 Cal.App.4th 166, 174-176.) However, if no tribe responds that J.D. is an Indian child, the juvenile court is directed to reinstate the order terminating parental rights.

## DISPOSITION

The order terminating parental rights is conditionally reversed and the case is remanded to the juvenile court with directions to order the department to comply with inquiry and notice provisions of ICWA. If, after receiving proper notice, no tribe indicates J.D. is an Indian child within the meaning of the ICWA, then the juvenile court shall reinstate the order terminating parental rights.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

                    FERNS

We concur:



_____, P. J.

     BOREN



_____, J.

     CHAVEZ


_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.